Councilor, you may approach when you're ready. Oh, you're going to sit from there? Okay, that's fine. I cannot hear you speaking, sir, so if you'll pull that microphone to you, that would be great. It looks like it was off. Can you hear me now, Your Honor? Yes, I can. Thank you so much. As I was just saying to the housekeeper, I apologize. There's a little bit of an echo. Let me push this back. I apologize that I need to be seated. I've just had a knee injury. Please don't apologize. You're quite welcome to argue from there. Is there a way we can adjust the echo before we begin? Kelly, we have interference at the table, at the mic. Let me try now. Test, test, test. That's much better. I think it's early. It's too early. I would like to reserve about three minutes before we begin. So, again, good morning, Your Honors. I may please the Court. My name is Benjamin Yockey. I represent the plaintiff, Nicole Gilbert-Daniels. Here with me is Mr. Jim Feinstein. We still have a little bit of an echo. I don't know. Is that better? That's better. Does the peripheral can you hear me clearly enough? Yes, I have been able to without echo. Okay. We just have a little bit of echo in this room, but I think it's better now. Okay. All right. Again, we represent the plaintiff in this case. She is the author of a play, Soul Kittens Cabaret, otherwise known as SKC. It is a registered copyright along with the filming of the play. We call it the DVD that was filmed of the actual performance of the play, both of which are registered copyrights. We allege in this case that the defendants wrote and produced the television show Pea Valley, which is at every single elementary level of the Ninth Circuit substantial similarity test, basically a ripoff of plaintiff's work. I've got a fairly extensive outline here of things that I'd like to discuss, but I see that our time is extraordinarily limited. With that, I'd like to maybe do something slightly unconventional and just kind of get into whatever questions that your honors may have, because I suspect you might have many. And if there's any that are burning, I don't want to leave you without the opportunity to address them. So are there any specifically that you'd like me to address? Well, I suppose my first and maybe my biggest question is that it seems to me that the themes that you identify as being substantially similar, such as the morality issues, good versus bad, choices that people make as mothers, daughters, partners, that those are things that flow pretty naturally from the setting of these two works and are unprotectable. So if you could address that, that would be helpful for me. Absolutely. And it's a terrific question because I believe that the district court approached this with something of a jaundice eye towards this general genre, this strip club genre of entertainment. This is why it was so important for us to have an expert to opine as to what is and what is not projectable, not so much at a legal level, but to distinguish, to separate the wheat from the chaff. What is an ordinary trope? What is sans affair? And what is unique to this genre? Our expert, Mr. Rudd-Aft, is, as the district court noted, no doubt extensively experienced in reading thousands of scripts. That's what he does. He reviewed a lot of the films, most of the films in this, let's call it a niche sub-genre, and he was able to do exactly what you say to separate what is and what is not projectable. But even over and above that, there's an important analysis, the selection and arrangement test, otherwise known as the Metcalf test. And I'd like to talk about the Metcalf test briefly because there's this insinuation from the district court that it is either a dying doctor or something that's hyper-narrow. The district court gave, I think, short shrift to the Metcalf test only to say, these are the issues or these are the facts that were at issue in Metcalf. And it concludes a restatement with no analysis to say, our facts don't come anywhere near to meeting the similarities in Metcalf at the selection and arrangement test. First of all, the two most recent cases in the Ninth Circuit that address Metcalf are an endorsement of Metcalf. You've got the Alford case, the Pirates of the Caribbean case, and there the court, the Ninth Circuit, stated that an expert might indeed be helpful in separating what might be a mere pirate troop from the rest of the film. Oh, was that a motion to dismiss the agent? It was a motion to dismiss the agent, but nevertheless, it talked about the importance of why expert testimony might be important. It was Judge Page that wrote that opinion, I believe you, Clare, for your honor, and that's one where, at the oral argument, he quizzed the appellant and asked, does this mean that we're going to have to have an expert in every case? And the appellant in that case said, no, but you do in this one. Counsel, I have a question, Peter, because we are examining the exclusion of the expert for abuse of discretion, correct? Yes, that's the statement. And there are cases such as Rice which have upheld the exclusion of expert testimony, particularly where, as in this case, it basically restates the things that were already offered by your client. And I guess I would appreciate your directly addressing Judge Thomas' question about why some of these tropes are not too generic to be protectable. Sure. Okay, so first of all, the abuse of discretion standard is indeed the applicable standard here. There remains, even post the amendment to Article 702, a liberal thrust towards admissibility. The expert in this case opined that he had studied extensively this genre so that he could separate what might otherwise be perceived as sans affair from everything else. Moreover, the expert report goes in, to address Judge Thomas' question, goes to address the chronology of all the scenes. The appellees will charge that this is just a shotgun approach to a bunch of similarities scattered throughout. It's not the case. Our expert talked about, importantly, that this was in a chronological order. Similarity at every one of the relevant elements under the Ninth Circuit's substantial similarity test. Just to follow up on what my colleagues are saying, there is something that sometimes naturally flows from a chronology as well. If a dancer is going to show up at a city as an ingenue, and then there's a character arc to that, you would expect the arrival first, as you were trying to point out in your briefing, a beginning, a middle, and an end. But if it's at a high level of generality, how does that start to fit into a Metcalf framework where it's very highly specific details that seem to be more of a rip-off as you were describing it earlier? So I would argue that we both meet the test of regular substantial similarity in addition to the Metcalf test. It's not like Metcalf is just a pack up here. The similarities here are not just so common that every one of them necessarily flows. Let me give you a couple of examples. There is, and I want to further address in this example, how the district court erred in not honoring the rule that the tie ball goes to the non-movement on summary judgment in cases of substantial similarity. In this case, wherever there was an opportunity for him to draw an inference in favor of a non-movement, not only did he choose between A and B, he found a C. So for example, we highlighted three points in our brief, and I'll give you a bonus one here in a little argument. There is, we have in both works, the owner of the club is an African-American LGBTQ person. There's four or five core dancers, one of whom is a queen bee, and we have the newbie dancer arriving. It's established that this newbie dancer comes to the club carrying nothing but a red vintage suitcase. She's shy about her body. She gets the job. There is the casino, excuse me, the owner of the club is fending off closure from the local casino. They could have chosen anything other than a casino, but that's the issue that was involved in both works. Judge Wilson here gives short shrift to the casino element in our work, Pea Valley, saying it was only a minor element. Our expert refutes that. He says, no, the casino element is indeed an important plot arc, and I'm not sure where. Well, I can't solve it, and this goes back to what's being repeated by the expert versus your arguments, but the casino development plot point in Pea Valley runs through the entire first season. It seems to be a fleeting reference, and it was difficult to surmise where it came from because it wasn't very clear in the briefing, but it seems to be just a passing reference in the play and in the movie. How does it figure prominently in your view in SKC? Because it is a prominent bond in SKC. The takeover is not minor, and perhaps if you just control F for the word casino in SKC and see it a couple of times, you think it's a minor plot line, and I think the district court frankly just adopted the contention of the Abilese, but if you were to actually study both works and actually watch all of SKC, you'll see that it is indeed a major plot line, but that's again another example of how the court just didn't draw the inference to the non-movement. How many times was it referenced? I couldn't tell you that. You're here trying to dispute that there are no tribal issues of fact, so your contention is that this is a major plot point, so can you back it up with some references to the record? At the moment, not specifically. I could just tell you that it is woven throughout the entire thing. It is not fleeting reference. Then how else did the district court sort of look at this with a jaundiced eye against your claim? Sure. So, for example, the LGBTQ African American club owner, the district court gives a lot of skepticism to that similarity, saying that, well, one is non-binary and one is gender fluid, and are those differences important? Yes, in general. But for purposes of what we're talking about here in substantial similarity, that's not what we should be talking about. When the district court chides us by saying that, well, we allege that when the newbie dancer arrives by a taxi cab in Pea Valley, speaking of SKC, and a bus in Pea Valley, the district court says, well, you're mischaracterizing the evidence because that's not public transportation. But, Your Honors, I would submit to you that if we're quibbling about the definition of what is and is not public transportation, that is not what the district court is supposed to do. Before your time is up, I would like you to address what I see as a problem for your side of the case, and I'd like to hear your response to it. To me, the themes, the dialogue, the mood, the setting, and the pace could not be more different between your client's protected work and Pea Valley, which is dark and violent and all about domestic violence and the place of religion and a bunch of things that have nothing to do with SKC. So, just taking a step back, why are these, sort of what I view as smaller things, sufficient to overcome those huge dissimilarities? I would disagree that they are so shockingly different. Perhaps the opinion of Judge Wilson says that, but this is, again, where the judge oversees. You have to know for a review, but I'm asking you why my view is wrong. Sure. Well, I point again to the expert opinion, which, again, is not a rubber stamp of just what our client says. They give extensive examples of what is similar. You pointed out religion is the same religion is not an important component of Pea Valley. That's in the district court's opinion, but then again, that's an inconsistency because in the opinion itself, in the very next sentence, after the district court says that religion is not an important feature in SKC, it goes on to say that religion is indeed a feature in SKC. It is internally inconsistent. Let me give you one more example, and this typifies the district court's error, okay? There's a scene where the newbie dancer goes to change in the restroom at the beginning of her career in this strip club movie. Changing in the restroom in this kind of modest context is a little bizarre, right, because it is a strip club. They're in the back with all the girls, okay? The district court does two things. One, she disagrees with our characterization that the character in SKC changed in the bathroom, notwithstanding the fact that in the record there is, quote, I'm a little bit shy about my body. Can you show me where the bathroom is? So, of course, she's changing in the bathroom in SKC. Then in Pea Valley, the district court goes on to say she changed in the bathroom not because she was modest but because she had to hide a gun and drop down a bottle of alcohol. By the way, that bottle of alcohol was a miniature. She took two sips of it. But in the play, in Pea Valley, one of the other dancers says she's been here a week. What has she got to be ashamed of? Of course, modesty is the issue for both characters in that scene. Yet the district court, instead of choosing between A and B, he went out of his way to find C, a different interpretation, a preconceived notion that these things are dissimilar, which is not supposed to be the focus. He's supposed to be focusing on what we allege are similarities, taking as true our allegations, and did not give, on summary judgment, the non-movement, the inference that we deserve. You're running into rebuttal time. Let me see if my colleagues have any other questions. No, not right now. Okay. We'll give you a little bit of extra time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, my name is David Halberstadter, and I'm appearing on behalf of the appellees. Your Honor, just because appellant and appellees disagree about the accuracy, the validity, or the significance of appellant's comparisons of the works, does not mean a material factual dispute over substantial similarity exists. In fact, if that were the case, summary judgment would never be appropriate on substantial similarity grounds because the adverse parties always disagree about the claimed similarities. Rather, it's the works themselves that control, not what the parties say about those works. And it is the objective evaluation of the works using the extrinsic test that determines whether a reasonable jury could or could not find the works to be substantially similar in protected expression. The district court engaged in that objective evaluation. It reviewed the works. It carefully identified the elements of plot, theme, dialogue, mood, setting, pace, and characters that were unprotectable. It filtered those elements out of the analysis. The district court then compared what was left to the protectable expression in the works. The court found that a number of the 57 purported similarities that appellant identified were actually not based on any of the three Soul Kittens cabaret works that were in issue. By appellee's count, there were at least 10 of those. The district court found that a significant number of the remaining similarities were the result of appellant's mischaracterizations of one work or the other or both. By our count, there were at least 10 or 11 of those as well. The district court then found that appellant had made still other alleged similarities seem similar by taking particular elements out of context and describing them generically when the actual expression was markedly different. Based upon its extensive and thorough analysis, the district court concluded that no reasonable jury could find substantial similarity between the works' respective plots, themes, dialogue, mood, setting, pace, and the characters. It would be helpful if you could address for me the issue of the expert declaration and why the expert's 30-year career was not sufficient to qualify him as an expert. Certainly. Well, to answer that narrow, specific question, there are a lot of people in the entertainment industry who read scripts as part of their job. And if they've had a career as long as this expert has, they've probably read thousands too. But that doesn't qualify an individual to opine on substantial similarity if they don't have any background in literary analysis, literary criticism, or even as part of their job comparing works for this specific purpose. Counsel, is there a case that says that an expertise in literary analysis and criticism is a prerequisite for this type of expertise? Well, I would say, Your Honor, that this judge, Judge Wilson in Gable, reached that conclusion in striping the expert testimony of Professor David Nimmer, who was a well-recognized scholar in copyright but had no expertise in literary analysis. And this court affirmed that exclusion. So I don't know that there are any other cases that would support this, but you're relying on the abuse of discretion standard of review. Yes, very much so. In fact, as this court knows, expert determinations lie peculiarly within the sound discretion of the trial court. And reviewing courts afford the trial court a high degree of deference. So for this court to overturn the granting of the motion to strike, it has to be firmly convinced that the district court decision lies beyond the pale of reasonable justification. Let me ask this. You know, counsel pointed out that expert opinion can be helpful in letting courts sit through an objective test. When is it useful in some circumstances versus this one? Why was this not one of those instances? Well, first of all, instances in which an expert witness on prior art, for example, could be relevant, is if there is a significant body of preexisting works that employs similar elements of expression and so forth, and an expert who is fully knowledgeable in that prior art, not someone like Mr. Aft who watched three other films. Someone who is knowledgeable in that prior art might be useful in identifying factors that might otherwise on their face seem to be predictable expression, but which are, in fact, common tropes for a genre. But that's not in this case. If we were to disagree with you about the ruling concerning the plaintiff's expert, what would be the result of that? Would we have to re-bend or would we simply consider the expert's declaration as part of our de novo analysis of substantial similarity? Thank you, Your Honor. I do not believe that the head of the district, well, first of all, let me say that before responding to that question, I will. It does not matter whether any of the members of this panel, had they been sitting at the district court level, would have ruled differently. That's not the test. The test is whether or not the judge can judge. My question is a different question. I want you to assume, for the sake of my question, that we think the district court was wrong, then wrong. I do not believe it would be necessary to remand. I think this court, reviewing the record de novo, has the report as part of the record, and it could review the report and, according to what weight this panel thinks it is due. I would add that I don't believe, had the district court considered the expert report, that it would have changed anything because the expert largely parroted appellant's comparisons, which the district court found repeatedly to mischaracterize the works. Have I answered your Honor's question? Yes, thank you. Thank you. So, there are a couple of things that I wish to stress. Well, first, the similarities that are alleged to have existed between her soul-kidnapped cabaret works and Appellee's television series Pea Valley, in my view, were even less compelling than those in the seminal Ninth Circuit decisions in which this court affirmed summary judgment for the defendant, Appellee, on substantial similarity grounds. Without, may I add, any expert testimony. Those other cases include Litchfield v. Spielberg, Berkich v. Creighton, Kauff v. Walt Disney, Thunke Films v. Time Warner, Binet v. Warner Brothers, and Gable v. National Broadcasting System, Net Broadcasting Company, and many others. In all of those cases, the court reviewed the works themselves, just as the district court had done, and without expert testimony, it consistently found, just as the district court found in this case, that many of the comparisons made in those cases involved unprotectable ideas, stock elements, stock characters, that the claimed similarities mischaracterized one or the other of the works, such as the works were not actually similar in their protected expression, and that any remaining elements were nothing more than random similarities scattered throughout the works and were a different expression of common unprotected ideas and themes. In my view, the significance of Appellant's completely false comparisons cannot be understated. Appellees pointed out in their answering brief that at least ten of Appellant's claimed similarities between SKC and Peave Alley were not based on SKC. Rather, they were based on a different work by the Appellant, a TV pilot script called Curtains, which may have been based upon Salt Pittan's Cabaret, but it is not a registered work, and it was not a subject of Appellant's infringement claims. They did it again today by referencing the scene in which the dancer arrives by public transportation. The public transportation element is not present in any of the SKC works that are at issue. It was included in the Curtains script, but not in the script at issue. There is no question or dispute about this. Plaintiff's own comparison video clearly shows the source of these ten purported similarities as being from Curtains, but Appellant did not withdraw these claimed similarities on appeal. Rather, she just doubled down. Likewise, the significance of Appellant's blatant mischaracterizations of the works also cannot be understated. Throughout its order, the District Court identified comparisons that mischaracterized one work or the other in order to manufacture a similarity, and even when it didn't call out Appellant expressly, it was implicit in the Court's repeated findings that one element or another was expressed differently as between the works, such that Appellant's comparisons were actually disingenuous, and they're doing it again today. Can I ask this, Counsel? In terms of the comparison of Tata Burlesque from SKC and Uncle Clifford from Pea Valley, there's, I guess, a dispute between the sides as to whether gender fluidity versus a gay male character is a notable distinction or could be grouped together. Can you speak a little bit to that point? Well, sure. I would, you know, I'm not in either category, but I imagine that if I were a gay man, I would consider gender fluidity different, and similarly, if I were a gender fluid individual, I would probably react to being characterized as a gay man. Counsel, there's also the distinction in the way these are expressed in terms of their identities. I mean, Tata doesn't have, you know, long silver nails and some of the other things that occur with Uncle Clifford. Yes, that's correct. Uncle Clifford identifies as female. He wears predominantly female clothing. I believe there's maybe one scene when he was going to a bank where he took off his nails and dressed as a male. Uncle Clifford uses exclusively feminine pronouns. Todd Topperless, by contrast, dresses like a male, refers to himself with male pronouns, and is an entirely different character. Have I answered your question? You did. I mean, really what I'm thinking about is what level of specificity would we need to get to in this context, for example, because there aren't that many stories about an LGBTQ-related owner of a cabaret or a nightclub, and so we could slice it further down, and I take your point that there are these differences, but is that necessary for the sufficiently similar analysis? No, it is not necessary, Your Honor, because there are many other differences, including how each of those characters came to own the club, how those characters could potentially lose their club, how those characters interact with the dancers at the club, how that character interacts with the antagonist, and so forth. So there are so many differences in the expression of each of those characters and what they do and their role in the story that you don't really have to parse that piece of it out. Correct, correct. Do you want to take a moment to address the casino element in these cases and how much of a driver it is in the relative works? Yes, I'm happy to, and Your Honor asked opposing counsel a question about how many times it was referenced in Soul Kittens Cabaret, and I don't remember it for sure, but I think it was twice, and it may have only been twice in one of the works and not in either of the other two. It was not a plot element at all. Further, the character to whom they're attributing this casino plot development, Frank, is the deceased lover of Tata Burlesque, who gave the club in his will to Tata Burlesque, and it is apparent far, far more so in all of the three Soul Kitten Cabaret works that he is driven by animus. He thinks that Tata Burlesque bewitched his father, turned him gay. I use turned in air quotes, turned him gay, and he thinks he is the rightful owner of the club, so he wants to do anything he can to get that club back. It has nothing to do with a casino development. Have I answered your question? No. Thank you. Great. So the other item, as I mentioned, Appellant has doubled down on these mischaracterizations and did it just now in his oral argument. Appellant's counsel focused on the shyness, the purported shyness of the new girls in each work by focusing in Tea Valley on what the other dancers perceived Bottom to be doing while she was changing in the bathroom. She was not changing in the bathroom because she was shy. She was changing in the bathroom because she was checking her weapon and having some alcohol. The other dancers obviously didn't know that because she was changing in the bathroom, and so they wondered how could she be ashamed of her body at this stage, but it's not the same as Brandy in Soul Kittens Cabaret who was genuinely shy about her body and was changing in the bathroom because she was shy about it. That was a perfect example of how Appellant had mischaracterized one work or the other to make them seem similar when they were not. Before you wrap up, can you address the Metcalfe point? Even if you have unpredictable elements, if they're arranged in a sort of way that creates a substantial similarity, is there a triable question as to that issue? No, there is not. First, I will note for the record that Appellant in her opening brief does not argue that the district court misapplied the test. She argues that the court neglected the test, which obviously isn't true because the order granting summary judgment spends two pages considering that test. It does not create a triable issue of fact because, as the district court had noted throughout its opinion, the alleged similarities even in unpredictable elements were based on mischaracterizations of one work or the other. In fact, the entire comparison analysis was plagued with mischaracterization and correctly concluded that the selection and arrangement of these unprotected elements in no way approached the level of similarity present in Metcalfe. I will add that in Metcalfe, this court found each major extrinsic element in the allegedly infringing work to be substantially paralleling the allegedly infringed work, and it found that the similarities in the selection and arrangement of these unprotected elements was striking. I would submit that there is no such similarity in the unprotected elements in this case, much less a striking similarity between the selection and arrangement of those elements. I see I have finished my time. If you all have any questions, I'm happy to answer them. Otherwise, thank you for listening. No other questions. Thank you, Counsel. And we can have two minutes for rebuttal. Thank you, Your Honor. Let me jump right into this. There's much talk about mischaracterization, which is really kind of hard to hear because it's just untrue, and you have to look no further than the record itself. Let's take the bathroom example where Counsel said that we mischaracterized the record, and so did the district court. Go ahead and look at 2ER-171 and 2ER-216. If we're parsing out whether the characters were modest and shy about their bodies, and that's the reason for them going to the bathroom to change in the back quarters of a strip club, look for yourself. But this tripartite disagreement between Appellant's, Appellee's, and the district court, that crystallizes how we have differing interpretations of what both works meant at the time. That is the province of the jury that the district court, in this case, violated. Okay? Let me speak to the expert issue. We cited a larvae article that was in peer-reviewed study on substantial similarity analyses, and it says it is folly to expect judges to be familiar with and understand the nuances of any given field, including those such as literature, that we often falsely imply are not as complicated as computer software architecture or others. Look at the homogamy case. This is a Judge Wilson case that was reversed by Judge Pays just a month before our case was rendered. In homogamy, Judge Wilson gave short shrift to the complexity of the dance and also to the length of the work at issue relative to the work as a whole. The Ninth Circuit reversed and said that's not the analysis. You have to look further at the elements. Just because it's too short and too simple in your mind, that's a judgment call. This is something where expert testimony might be helpful, and that's what the district court said. When I was growing up, listening to rap music, my parents would say, why are you listening to that? Every song sounds the exact same thing. And I would revert to my dad and say, well, all the country music you listen to sounds exactly the same. And his response would be something along the lines of, were you talking about country or were you talking about western? And this goes to show that just viewing things from a wide circle and not being familiar with the works themselves, I think district courts, and Judge Wilson in particular in this case, assumed too much to think that he had the requisite expertise to view the substantial similarity in this analysis. I don't think Judge Wilson is an expert in the strip club genre. I'm certainly not. But Robert Aft had reviewed several works, went through every single one of the Ninth Circuit's elements of substantial similarity and found that they were indeed substantially similar. Again, I can't highlight enough that in the Ninth Circuit, substantial similarity on summary judgment is very narrow. The balls and strikes need to go to the non-movement. The district court didn't do that here. He went out of his way to find in favor of the movement with the preconceived notion that there was no substantial similarity. Further, just for the same reason, this is the last one I'll make, for the same reason that in the Ninth Circuit it said just listing a bunch of random similarities should be discounted, so too should be the list of dissimilarities. I can count a thousand dissimilarities between works. That doesn't mean that both works aren't substantially similar. Look at the Ninth Circuit's case in Alfred. It noted that the script versus the movie, there are striking differences and there might be here, too. It doesn't mean that they are not substantially similar for purposes of copyright infringement in the Ninth Circuit. Thank you, Your Honor. Counsel, thank you both. Very helpful arguments. The matter will stand submitted and court is adjourned. All rise. This court for this session stands adjourned.
judges: GRABER, SANCHEZ, THOMAS